## Case Nos. 22-6071 (L), 22-6075

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

---

AMERICAN SOUTHWEST MORTGAGE CORP.;
AMERICAN SOUTHWEST MORTGAGE FUNDING CORP.,
*Plaintiffs/Appellees/Cross-Appellants,*

v.

CONTINENTAL CASUALTY COMPANY,
*Appellant/Cross-Appellee.*

---

*Appeal from the United States District Court for the Western District of Oklahoma (Oklahoma City),
Case No. 5:20-CV-00422-PRW · Honorable Patrick Robert Wyrick, U.S. District Judge*

# FIRST BRIEF ON CROSS-APPEAL
## *Oral Argument Is Requested*

ROGER N. BUTLER, JR.
SECREST HILL BUTLER & SECREST
7134 South Yale Avenue
Suite 900
Tulsa, Oklahoma 74136
(918) 494-5905 Telephone
(918) 494-2847 Facsimile
rbutler@secresthill.com

RICHARD A. SIMPSON
PAMELA L. SIGNORELLO
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
(202) 719-7000 Telephone
(202) 719-7049 Facsimile
rsimpson@wiley.law
psignorello@wiley.law

*Attorneys for Appellant/Cross-Appellee Continental Casualty Company*

 

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned

counsel for Defendant-Appellant Continental Casualty Company certifies as

follows:

Continental Casualty Company is wholly owned by The Continental

Corporation, which is not publicly traded.  The Continental Corporation is wholly

owned by CNA Financial Corporation, which is majority owned by Loews

Corporation.  No other corporation owns more than 10% of the stock of CNA

Financial Corporation.  CNA Financial Corporation and Loews Corporation are

publicly held companies.

/s/ Richard A. Simpson
Richard A. Simpson

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUE PRESENTED .........................................1

STATEMENT OF THE CASE..................................................................2

    I.      PROCEDURAL HISTORY .............................................................2

    II.     STATEMENT OF FACTS...............................................................7

          A.    The Policy ............................................................................7

          B.    The Lender Lawsuits...........................................................9

          C.    Continental defends Auditor and settles the Lender
              Lawsuits. ............................................................................10

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT .........................................................................................14

    I.      OKLAHOMA LAW COMPELS APPLICATION OF PLAIN
          POLICY LANGUAGE ACCORDING TO ITS TERMS. ................14

    II.     THE DISTRICT COURT CORRECTLY DETERMINED
          THAT THE POLICY'S INTERRELATED ACTS OR
          OMISSIONS DEFINITION IS UNAMBIGUOUS. ..........................15

    III.    REGARDLESS OF THE NUMBER OF AUDITS
          CHALLENGED, THE LENDER LAWSUITS ARE A SINGLE
          CLAIM BECAUSE THEY ARISE OUT OF THE SAME ACT
          OR OMISSION OR ACTS OR OMISSIONS THAT ARE
          *LOGICALLY CONNECTED* BY *ANY* COMMON FACT OR
          CIRCUMSTANCE...........................................................................18

          A.    Case law from within the Tenth Circuit supports a broad
              reading of the unambiguous interrelated claims provision,
              to include all claims sharing any common connection. ...........20

          B.    Case law nationwide holds that the focus of broad
              definitions of "related claims" or "interrelated claims"
              like that here must be on whether the claims have any

# TABLE OF CONTENTS

(continued)

Page

logical or causal connection, not on any differences
between them. ..........................................................................25

C.     The district court's analysis failed to accord the policy
language its plain meaning.......................................................30

CONCLUSION....................................................................................................33

ORAL ARGUMENT STATEMENT ....................................................................34

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................35

ADDENDUM

ORDER [Doc. No. 41], Filed August 25, 2021 .....................................Add.1

ORDER [Doc. No. 51], Filed April 4, 2022........................................Add.15

JUDGMENT [Doc. No. 52], Filed April 4, 2022................................Add.19

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

*American Casualty Co. of Reading, Pennslyvania v. Belcher*,
  709 F. App'x 606 (11th Cir. 2017) (unpublished)......................................13, 26

*American Medical Security, Inc. v. Executive Risk Specialty Insurance Co.*,
  393 F. Supp. 2d 693 (E.D. Wis. 2005) ................................................................28

*Apartment Investment & Management Co. (AIMCO) v. Nutmeg Insurance Co.*,
  593 F.3d 1188 (10th Cir. 2010) ..........................................................................14

*Berry & Murphy, P.C. v. Carolina Casualty Insurance Co.*,
  586 F.3d 803 (10th Cir. 2009) ......................................................................16, 25

*Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*,
  715 F.3d 1231 (10th Cir. 2013) ..........................................................................22

*Bryan Bros. Inc. v. Continental Casualty Co.*,
  704 F. Supp. 2d 537 (E.D. Va. 2010), *aff'd*, 660 F.3d 827 (4th Cir. 2011) .......16

*Camico Mutual Insurance Co. v. Rogozinski*,
  No. 3:10-cv-762-J-32MCR, 2012 WL 4052090
  (M.D. Fla. Sept. 13, 2012) (unpublished)...............................................28, 29, 32

*Ciber, Inc. v. ACE American Insurance Co.*,
  261 F. Supp. 3d 1119 (D. Colo. 2017)................................................................25

*Continental Casualty Co. v. Howard Hoffman & Associates*,
  955 N.E.2d 151 (Ill. App. Ct. 2011) ...................................................................17

*Continental Casualty Co. v. Wendt*,
  205 F.3d 1258 (11th Cir. 2000) ....................................................................17, 27

*Direct General Insurance Co. v. Houston Casualty Co.*,
  139 F. Supp. 3d 1306 (S.D. Fla. 2015), *aff'd*, 661 F. Appx. 980
  (11th Cir. 2016)...................................................................................................28

*Dodson v. St. Paul Insurance Co.*,
  812 P.2d 372 (Okla. 1991)..................................................................................14

*GEICO General Insurance Co. v. Northwestern Pacific Indemnity Co.*,
  115 P.3d 856 (Okla. 2005)..................................................................................15

# TABLE OF AUTHORITIES
## (*Continued*)

**Page(s)**

*Glascoff v. OneBeacon Midwest Insurance Co.*,
No. 13 Civ. 1013 (DAB), 2014 WL 1876984
(S.D.N.Y. May 8, 2014) (unpublished) ............................................................. 28

*Gregory v. Home Insurance Co.*,
876 F.2d 602 (7th Cir. 1989) ......................................................................... 27

*Health First, Inc. v. Capitol Specialty Insurance Corp.*,
747 F. App'x 744 (11th Cir. 2018) (unpublished) ............................................ 17

*Hensley v. State Farm Fire & Casualty Co.*,
398 P.3d 11 (Okla. 2017) ............................................................................... 15

*Kilcher v. Continental Casualty Co.*,
747 F.3d 983 (8th Cir. 2014) ......................................................................... 27

*Liberty Insurance Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*,
162 F. Supp. 3d 1068 (C.D. Cal. 2016), *aff'd,* 708 F. Appx. 374
(9th Cir. 2017) ............................................................................................... 27

*McIntosh v. Scottsdale Insurance Co.*,
992 F.2d 251 (10th Cir. 1993) ....................................................................... 14

*MF Nut Co., LLC v. Continental Casualty Co.*,
Civ. No. 11-00004 LEK-BMK, 2013 WL 164425
(D. Haw. Jan. 15, 2013) (unpublished) ........................................................... 17

*Market St. Bancshares, Inc. v. Federal Insurance Co.*,
962 F.3d 947 (7th Cir. 2020) ......................................................................... 19

*Morden v. XL Specialty Insurance*,
903 F.3d 1145 (10th Cir. 2018) ............................................................... 21, 22

*National Union Fire Insurance Co. of Pittsburgh, Pennslyvania v. Willis*,
296 F.3d 336 (5th Cir. 2002) ......................................................................... 19

*Oregon State Bar Professional Liability Fund v. Benfit*,
201 P.3d 936 (Or. Ct. App. 2009) .................................................................. 17

# TABLE OF AUTHORITIES
## (*Continued*)

Page(s)

*Porter v. Oklahoma Farm Bureau Mutual Insurance Co.*,
330 P.3d 511 (Okla. 2014)....................................................................15

*Professional Solutions Insurance Co. v. Mohrlang*,
Civ. Action No. 07-cv-02481-PAB-KLM, 2009 WL 321706
(D. Colo. Feb. 10, 2009) (unpublished), *aff'd*, 363 F. App'x. 650
(10th Cir. 2010) (unpublished) ...............................................5, 25, 30, 31, 32, 33

*Southern Corrections Systems, Inc. v. Union City Public Schools*,
64 P.3d 1083 (Okla. 2002)....................................................................15

*Southern Hospitality, Inc. v. Zurich American Insurance Co.*,
393 F.3d 1137 (10th Cir. 2004) ...........................................................15

*Starr Indemnity & Liability Co. v. MonaVie, Inc.*,
No. 2:14-cv-00395-DN, 2019 WL 1227930 (D. Utah March 15, 2019)
(unpublished) ...........................................................................................25

*Stauth v. National Union Fire Insurance Co.*,
Nos. 97-6437, 97-6438, 1999 WL 420401 (10th Cir. June 24, 1999)
(unpublished) ...........................................................................................17

*Templeton v. Catlin Specialty Insurance Co.*,
612 F. Appx. 940 (10th Cir. 2015) ............................................................23, 24

*Templeton v. Fehn*,
No. 12-cv-00859-RPM, 2014 U.S. WL 2861832 (D. Colo. June 24, 2014)
(unpublished). ..........................................................................................24

*UBS Financial Services, Inc. of Puerto Rico v. XL Specialty Insurance Co.*,
929 F.3d 11 (1st Cir. 2019).....................................................................19

*W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*,
No. GJH-14-00425, 2014 WL 5812316 (D. Md. Nov. 7, 2014),
*aff'd*, 814 F.3d 171 (4th Cir. 2016) (unpublished) ......................................17, 19

*Westport Insurance Corp. v. Mylonas*,
Civ. Action No. 14-5760, 2016 U.S. Dist. LEXIS 114867
(E.D. Pa. Aug. 25, 2016) (unpublished) ...................................................... 18, 19

# TABLE OF AUTHORITIES
## (*Continued*)

**Page(s)**

**Statutes**

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1332 .................................................................................................1

**Other Authorities**

Fed. R. App. P. 6(b), 4(a)(1)(A) .......................................................................1

## STATEMENT OF RELATED CASES

There are no prior or related appeals pending in this Court.

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Oklahoma (Patrick R. Wyrick, J.) properly exercised jurisdiction based on diversity of citizenship. Plaintiffs American Southwest Mortgage Corporation ("American Southwest Mortgage") and American Southwest Mortgage Funding Corporation ("American Southwest Mortgage Funding") are Oklahoma corporations with their principal places of business in Oklahoma, and accordingly are citizens of Oklahoma. App. Vol. 1 at 14, 27.[1] Defendant Continental Casualty Company ("Continental") is an Illinois corporation with its principal place of business in Illinois, and accordingly is a citizen of Illinois. App. Vol. 1 at 15, 28. The district court had jurisdiction under 28 U.S.C. § 1332.

The district court entered final judgment on April 4, 2022. App. Vol. 2 at 565. Continental filed a timely notice of appeal on April 29, 2022. App. Vol. 2 at 566; Fed. R. App. P. 6(b), 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE PRESENTED

This is an insurance coverage case involving the limit of liability under an accountants professional liability policy applicable to lawsuits brought by two lenders against an accounting firm, each alleging that the accounting firm

---

[1] "App. Vol." refers to the Appendix Volume.

negligently failed to discover that the same audit client was engaged in an ongoing

scheme that resulted in the lenders' lines of credit being unsecured.  The limit of

liability turns on the following issue:

> **Interrelated claims** means all **claims** arising from acts or omissions that are
> "logically or causally connected by any common fact, circumstance,
> situation, transaction, event, advice or decision."[2]  Two lenders filed
> contemporaneous lawsuits alleging that they each extended credit in reliance
> on the same series of audits that negligently failed to discover the same
> ongoing scheme.  Do the lawsuits assert **interrelated claims**?

## STATEMENT OF THE CASE

## I.    PROCEDURAL HISTORY

Plaintiffs American Southwest Mortgage and American Southwest Mortgage

Funding (together, "Lenders") commenced this action against Continental on May

6, 2020.  App. Vol. 1 at 9 (Docket #1), 14-26.  This suit follows the settlement of

underlying litigation (the "Lender Lawsuits") brought by Lenders against the

accounting firm Robison Gary Johnson & Associates, PLLC ("Auditor"), which

was insured under an accountants professional liability insurance policy issued by

Continental (the "Policy").  App. Vol. 1 at 16 (¶ 14), 30 (¶ 14), 48 (¶ 1), 51 (¶ 1).

---

[2] Other than headings, words in bold are bolded and defined in the applicable
policy.

Pursuant to the settlement, a consent judgment in the amount of $1.5 million was entered against Auditor in each of the two Lender Lawsuits (together, the "Consent Judgments").  App. Vol. 1 at 49 (¶¶ 4-5), 52 (¶ 10), 53 (¶ 16), 194-95, 247-48.  In exchange for Lenders' release of Auditor and their agreement not to execute on Auditor's assets, Continental agreed on behalf of Auditor to pay (and has paid) the Policy's entire $1 million per **claim** limit of liability, $500,000 to each of the Lenders.  App. Vol. 1 at 49 (¶¶ 5-6), 53 (¶ 19).

Auditor assigned to Lenders any right of further recovery under the Policy. Continental and Lenders agreed to litigate the sole issue of "whether any additional coverage [beyond the $1 million per **claim** limit of liability under the Policy] is available for the Consent Judgment(s) under Continental's Policy" and to do so based exclusively on a set of stipulated facts.  App. Vol. 1 at 15 (¶ 7), 48 (¶ 1), 54 (¶ 23), 258 (¶ 15).

The Lender Lawsuits involved lending arrangements with First Mortgage Company, L.L.C. ("First Mortgage"), in connection with which Lenders relied on audit reports prepared by Auditor on the financial statements of First Mortgage for the years ending December 31, 2014, December 31, 2015, and December 31, 2016 (the "Audits").  App. Vol. 1 at 51-52 (¶¶ 2-8), 52-53 (¶¶ 11-14).  Each of the Lender Lawsuits asserted a cause of action against Auditor for negligence in connection with its failure to identify the same issue in all of the Audits – namely,

-3-

that First Mortgage had caused loans on its warehouse lines of credit to be "out of trust."[3]  App. Vol. 1 at 52 (¶ 8), 53 (¶ 14), 181-82 (Count V), 232-33 (Cause of Action XI).

Lenders' complaint against Continental sought a judicial declaration that the Policy's $3 million aggregate limit of liability applies to the Lender Lawsuits. App. Vol. 1 at 24-25 (¶ 41).  Continental filed a Counterclaim seeking a judicial declaration that the Lender Lawsuits constitute **interrelated claims** to which a single $1 million per **claim** limit of liability applies.  App. Vol. 1 at 37-38.

On October 13, 2020, Continental and Lenders each moved for summary judgment.  App. Vol. 1 at 11 (Docket #s 30-31).  Following briefing, on August 25, 2021, the district court issued an order denying Continental's motion for summary judgment and granting in part Lenders' motion for summary judgment.  App. Vol. 2 at 433-446.  The district court concluded that (1) Lenders' "claims arising from a given audit report are 'interrelated,'" while (2) Lenders' "claims arising from different audit reports are not 'interrelated.'"  App. Vol. 2 at 446.

---

[3] Here, an "out of trust" loan is a loan that has funds borrowed by First Mortgage on a warehouse line, but the promissory note securing those funds on behalf of the Lender has been released to the borrower by First Mortgage, causing the loan to be unsecured.  App. Vol. 1 at 51 (¶ 4).

-4-

On the first point, the district court determined that "all 'claims' stemming from a given audit report omission are a single claim for purposes of determining the applicable coverage limit."  App. Vol. 2 at 443-44.  According to the court:

> In practical terms, this means that when [American Southwest Mortgage Funding] and [American Southwest Mortgage] each assert claims for professional negligence stemming from the omission from the 2014 audit report, for example, their two claims are 'interrelated' and therefore subject to the per-claim cap of $1,000,000.00.

App. Vol. 2 at 444 (fn. 23).

On the second point, to the effect that claims arising from different audit reports do not arise out of **interrelated acts or omissions**, the court relied exclusively on a single, unpublished district court decision applying Colorado law, which was affirmed by this Court.  *Pro. Sols. Ins. Co. v. Mohrlang*, Civ. Action No. 07-cv-02481-PAB-KLM, 2009 WL 321706 (D. Colo. Feb. 10, 2009) (unpublished), *aff'd*, 363 F. App'x. 650 (10th Cir. 2010) (unpublished).  The district court reasoned that, under *Mohrlang*, acts or omissions are "logically connected" only if they "attend or flow from the other in an inevitable or predictable way."  App. Vol. 2 at 441.  At the same time, the district court acknowledged: "It is true that the omission from each audit report was the same" (App. Vol. 2 at 444) – namely, "the failure to identify the absence of security interests in each of the three audit reports" (App. Vol. 2 at 442).  Notwithstanding that conclusion, the court determined that, "[b]ecause these audits were discrete,

siloed efforts, the omissions made in each, though similar, are not connected in an inevitable or predictable way."  App. Vol. 2 at 444-45.

In its August 25, 2021 order, the district court identified a "dispute of material fact as to the number of audit reports" and directed "Continental to declare whether it agrees that there were two erroneous audit reports" (as Lenders argued in their briefing) and, if so, directed Lenders to show cause as to why the Court should not conclude that there were only two erroneous audit reports.  App. Vol. 2 at 446.  Continental promptly acknowledged that there were three annual audit reports (2014, 2015, and 2016) as stated in the stipulated facts and in Continental's summary judgment briefing.  At the same time, Continental argued that Lenders waived the right to argue that they relied on three audit reports by affirmatively asserting throughout their summary judgment briefing that there were only two audit reports (and affirmatively using that contention to support their argument on the **interrelated claim** issue).  App. Vol. 2 at 447-54, 553-60.

On April 4, 2022, the district court issued an order finding that "good cause exists to grant relief" from the stipulated fact that there were three audit reports "in order to prevent manifest injustice."  App. Vol. 2 at 562.  The court held Lenders "to the facts represented and relied on in their motion for summary judgment: that there were two erroneous reports."  App. Vol. 2 at 564.  Accordingly, also on April 4, 2022, the court entered final judgment that a $2 million limit of liability applies

to the Lender Lawsuits on the basis that "the two Plaintiffs' claims arising from the same audit report are 'interrelated,' while claims arising from different audit reports are not 'interrelated.'"  App. Vol. 2 at 565.  Because the court held that plaintiffs relied on two erroneous audit reports – the 2014 report and the 2016 report – the court determined that "[t]his results in two claims, and an applicable liability limit of $2,000,000."  App. Vol. 2 at 565.

Continental appeals from the district court's determination that the two Lender Lawsuits do not assert **interrelated claims** such that a single limit of liability applied.  It does not address in this brief Lenders' cross-appeal of the order holding Lenders to their representations that there were two erroneous audit reports.

## II.    <u>STATEMENT OF FACTS</u>

### A.    **The Policy**

Continental issued Accountants Professional Liability Policy No. APL128567086 to Auditor for the **policy period** of September 1, 2017 to September 1, 2018 (the "Policy").  App. Vol. 1 at 51 (¶ 1).  The Policy has a $1 million per **claim** limit of liability and a $3 million aggregate limit of liability for **damages**, which include monetary judgments, awards, and settlements.  App. Vol. 1 at 51 (¶ 1), 55 (Item 5), 65, 79.

The Policy's Coverage Agreement states, in relevant part:

[W]e will pay on **your** behalf all sums in excess of the deductible, up to [the] limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable….

App. Vol. 1 at 85 (Section II.A).  The Policy defines **claim** to mean "a demand received by [an **Insured**] for money or services" and specifies: "A demand shall include the service of suit" against an **Insured**.  App. Vol. 1 at 78 (Section I).

The Policy anticipates and explicitly addresses the situation in which multiple **claims** are made against an **Insured**:

> D.     Multiple insureds, **claims** and claimants
>
> > The limits of liability shown in the Declarations and subject to the provisions of this Policy is the amount we will pay as **damages** and **claim expenses** regardless of the number of **you**, **claims** made or persons or entities making **claims**.  If **interrelated claims** are subsequently made against **you** and reported to us, all such **interrelated claims**, whenever made, shall be considered a single **claim** first made and reported to us within the **policy period** in which the earliest of the **interrelated claims** was first made and reported to us.

App. Vol. 1 at 86 (Section III.D).

The Policy defines **interrelated claims** to mean "all **claims** arising out of a single act or omission or *arising out of **interrelated acts or omissions*** in the rendering of **professional services**."  App. Vol. 1 at 80 (Section I) (italics added).  In turn, it defines **interrelated acts or omissions** to mean "all acts or omissions in

-8-

the rendering of **professional services** that are *logically or causally connected* by *any* common fact, circumstance, situation, transaction, event, advice or decision." App. Vol. 1 at 80 (Section 1) (italics added).

## B.    The Lender Lawsuits

Each of the Lenders provided a warehouse line of credit to First Mortgage. App. Vol. 1 at 51 (¶ 3), 52 (¶ 11).  In connection with their ongoing lending agreements, Lenders relied on the Audits (App. Vol. 1 at 52 (¶ 5) and 53 (¶ 13)), which Auditor prepared (App. Vol. 1 at 51 (¶ 2)).  Each of the Audits failed to discover that First Mortgage had caused loans on its warehouse lines to be "out of trust."  App. Vol. 1 at 52 (¶ 6).  In March 2017, both Lenders terminated their lending arrangements with First Mortgage as a result of their discovery that First Mortgage had caused loans on the warehouse lines to be "out of trust."  App. Vol. 1 at 51 (¶ 4), 53 (¶ 12).

On March 20, 2018, American Southwest Mortgage Funding instituted a lawsuit styled *American Southwest Mortgage Funding Corp. v. Ron McCord, et al.*, Case No. CJ-2018-1555 (Okla. Cty., Okla. Dist. Ct.) (the "ASMFC Lawsuit"). App. Vol. 1 at 53 (¶ 14), 216-37.  Within a day or two thereafter, American Southwest Mortgage instituted a lawsuit styled *American Southwest Mortgage*

*Corp. v. Ron McCord, et al.*, Case No. CJ-2018-1579 (Okla. Cty., Okla. Dist. Ct.) (the "ASMC Lawsuit").[4]  App. Vol. 1 at 178-83.

The state court petitions in the Lender Lawsuits name the same three defendants: First Mortgage, Ron McCord (the Manager and majority owner of First Mortgage), and Auditor.  App. Vol. 1 at 178, 216.  Both petitions principally involve Lenders' lending arrangements with First Mortgage.  App. Vol. 1 at 178-83, 216-37.  Each of the Lender Lawsuits asserted a cause of action against Auditor for negligence in connection with its failure to identify the same issue in all of the Audits – namely, that First Mortgage had caused loans on its warehouse lines to be "out of trust."[5]  App. Vol. 1 at 181-82 (Count V), 232-33 (Cause of Action XI).

## C.   Continental defends Auditor and settles the Lender Lawsuits.

Continental provided a defense to Auditor and ultimately settled the Lender Lawsuits on Auditor's behalf in August 2019.  App. Vol. 1 at 48 (¶ 1).  As part of the settlement, Auditor agreed to the entry of a $1.5 million consent judgment

---

[4] It appears that the Lender Lawsuits were filed within one day of each other.  The file stamp on the complaint in the ASMC Lawsuit is March 21, 2018 (App. Vol. 1 at 178).  However, the parties' stipulation states that it was filed on March 22, 2018 (App. Vol. 1 at 52, ¶ 8).  The difference is immaterial.

[5] American Southwest Mortgage Funding also asserted a cause of action against all defendants for civil conspiracy, in which it generally alleged that "Auditors failed to accurately identify McCord and/or [First Mortgage's] financial condition in the audited report."  App. Vol. 1 at 233 (¶ 138).

against it in each of the Lender Lawsuits (the "Consent Judgments"). App. Vol. 1 at 49 (¶¶ 4-5), 52 (¶ 10), 53 (¶ 16), 194-95, 247-48. In exchange for Lenders' release of Auditor and their agreement not to execute on Auditor's assets, Continental agreed on behalf of Auditor to pay (and has paid) the Policy's entire $1 million per **claim** limit of liability, $500,000 to each of the Lenders. App. Vol. 1 at 49 (¶ 6), 53 (¶ 19). Auditor assigned to Lenders any right of further recovery under the Policy in connection with the Consent Judgments. App. Vol. 1 at 15 (¶ 7), 48 (¶ 1), 54 (¶ 23).

## **SUMMARY OF THE ARGUMENT**

The Continental Policy expressly provides that its limits of liability apply regardless of the number of **claims** made, the number of claimants, or the number of insureds involved. It then unambiguously provides that all **claims** arising out of a single act or omission or acts or omissions that are "logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision" are **interrelated claims** that "shall be considered a single **claim**."

Here, Lenders brought suits against Auditor *within at most two days,*[6] each alleging that it extended lines of credit to the *same borrower* in reliance on the

---

[6] As explained above, the file stamp on the second lawsuit indicates that it was filed the day after the first lawsuit, whereas the parties' stipulation puts the filing two days later.

*same audit reports* of the borrower in which Auditor negligently failed to identify the *same singular scheme* that caused the lines to be "out of trust," *i.e.*, unsecured. Under the Policy language, the Lender Lawsuits constitute **interrelated claims**. As Continental already has fully exhausted the per **claim** limit, Lenders are entitled to no further recovery under the Policy.

The district court determined, in accord with an extensive body of case law nationwide, that the Policy's "logically or causally connected" language is unambiguous. App. Vol. 2 at 440-41. Nonetheless, it held that the Lender Lawsuits were **interrelated claims** only to the extent that they "stemm[ed] from a given audit report omission." App. Vol. 2 at 443. In other words, to the extent that both of the Lender Lawsuits challenge the *same* audit report (*i.e.*, the *same* acts or omissions), they are "**interrelated claims**." The court also held, however, that acts or omissions in connection with one audit report are not "**interrelated**" to acts or omissions in connection with the other audit reports, such that "'claims' arising from the serial omissions from the audit report are not 'interrelated.'" App. Vol. 2 at 445.

The district court's holding that the two Lender Lawsuits do not assert **interrelated claims** conflicts with a veritable legion of cases from this Court and nationwide holding that the same (or substantially the same) policy language used in the Policy's definition of **interrelated acts or omissions** sweeps broadly to

encompass claims with far less in common than those here.  As the Eleventh Circuit held in construing the same language, the relevant inquiry "is not whether there are any differences between the…claims" but "whether the claims are logically or causally connected by 'any' common fact, circumstance, etc." *Am. Cas. Co. of Reading, Pa. v. Belcher*, 709 F. App'x 606, 609 (11th Cir. 2017) (unpublished).

Here, the district court expressly acknowledged that "the omission from each audit report was the same," namely, "the failure to identify the absence of security interests."  App. Vol. 2 at 444, 442.  However, it then failed to apply the plain meaning of the Policy's language specifying that **claims** are related if they arise from acts or omissions that are "logically connected" by "any" common fact or circumstance.  Auditor's alleged negligence with respect to each of its Audits of the same audit client in failing to discover the same ongoing, singular scheme that resulted in Lenders' lines of credit being out of trust fits comfortably within the zone of "**interrelated acts or omissions**" delineated by the Policy.

In short, the conclusion that the Lender Lawsuits assert **interrelated claims** follows *a fortiori* from an extensive body of cases applying the same policy language to claims with far less in common than those here.  Accordingly, Continental is entitled to judgment as a matter of law that the single per **claim** limit of liability applies to the Lender Lawsuits.

-13-

## **ARGUMENT**

This Court reviews both the district court's grant of summary judgment and its interpretation of state insurance law *de novo*. *Apartment Inv. & Mgmt. Co. (AIMCO) v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1192 (10th Cir. 2010); *McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993) (same).

## I.    **OKLAHOMA LAW COMPELS APPLICATION OF PLAIN POLICY LANGUAGE ACCORDING TO ITS TERMS.**

The legal principles applicable to the interpretation of the Policy are not in dispute.[7] Oklahoma's Supreme Court long ago settled and has consistently reinforced the rules to which courts applying Oklahoma law must adhere when interpreting the provisions of an insurance contract.

First and foremost, the plain language of the contract controls. "The terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991). "[N]either forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as

---

[7] The parties agree that Oklahoma law governs this contract dispute. App. Vol. 1 at 259; App. Vol. 2 at 291-92.

to import a more favorable consideration to either party than that expressed in the contract." *Porter v. Okla. Farm Bureau Mut. Ins. Co.*, 330 P.3d 511, 515 (Okla. 2014) (citation omitted). "The parties are bound by the terms of their agreement and the Court will not undertake to rewrite the same nor to make for either party a better contract than the one which was executed." *Hensley v. State Farm Fire & Cas. Co.*, 398 P.3d 11, 22 (Okla. 2017).

"The mere fact that the parties disagree or press for a different construction does not make an agreement ambiguous." *GEICO Gen. Ins. Co. v. Nw. Pac. Indem. Co.*, 115 P.3d 856, 858 (Okla. 2005) (citation omitted). Similarly, "[t]he Court will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision." *S. Corr. Sys., Inc. v. Union City Pub. Schs.*, 64 P.3d 1083, 1089 (Okla. 2002). In short, the Court will "not search for unusual or tortured meanings." *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1139 (10th Cir. 2004) (citing *Bituminous Cas. Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030, 1035 (Okla. 2002)).

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE POLICY'S INTERRELATED ACTS OR OMISSIONS DEFINITION IS UNAMBIGUOUS.

The inquiry framed by the Policy's plain language is straightforward: whether the Lender Lawsuits arise out of a single act or omission or **interrelated acts or omissions** – that is, acts or omissions that are "*logically* or causally

-15-

*connected* by *any* common fact, circumstance, situation, transaction, event, advice or decision."  App. Vol. 1 at 80 (Section I) (italics added).  If so, the Lender Lawsuits "shall be considered a single **claim**."  App. Vol. 1 at 86 (Section III.D).  The manifest commonalities both between and within the Lender Lawsuits compel but one conclusion: they involve, at a minimum, **interrelated acts or omissions**.

Numerous courts, like the district court below, have held that the same or substantially similar language to that in the Policy's definition of **interrelated acts or omissions** is clear and unambiguous.  *See, e.g., Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 810 (10th Cir. 2009) ("We do not find any of the terms above to be ambiguous – they all have plain and ordinary meanings that can be applied to the language of the insurance policy.") (internal citation omitted); *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704 F. Supp. 2d 537, 543 (E.D. Va. 2010) (holding that accountants' professional liability policy's definition of "interrelated acts or omissions" aggregating "all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision" is unambiguous and observing that "[o]f the courts that have considered whether this policy language is ambiguous, each has found that it is not ambiguous"), *aff'd*, 660 F.3d 827 (4th Cir.

2011).[8]  As the Eleventh Circuit has observed, "[t]here is no ambiguity" as to the meaning of the phrase "logical or causal connection" "unless one is <u>created</u> through the device of simply ignoring one half of the definition."  *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) (underlining in original).

Accordingly, the district court properly rejected Lenders' attempt to establish ambiguity with reference to inapposite, judicial authority (most notably, *Stauth v. National Union Fire Insurance Co.*, Nos. 97-6437, 97-6438, 1999 WL 420401 (10th Cir. June 24, 1999) (unpublished)), involving policy language either

---

[8] *See also Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018) (unpublished) (interpreting "plain language" of similar related claims provision as broad enough to "reach conduct with a somewhat attenuated connection"); *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 176 (4th Cir. 2016) (holding that substantially identical definition of "interrelated wrongful acts" was "expansive" and unambiguous); *MF Nut Co., LLC v. Cont'l Cas. Co.*, Civ. No. 11-00004 LEK-BMK, 2013 WL 164425, at *11 (D. Haw. Jan. 15, 2013) (unpublished) ("The instant Policy has a clear, broad definition of the term 'interrelated wrongful acts.'  This Court finds that the provision is not ambiguous, and will therefore interpret it in accordance with its plain meaning."); *Cont'l Cas. Co. v. Howard Hoffman & Assocs.*, 955 N.E.2d 151, 163 (Ill. App. Ct. 2011) ("We are persuaded by [the foregoing] case law and hold that the policy definitions of 'related claims' and 'related acts or omissions' contained in the Continental policy at issue here are not ambiguous because they include the concept of a logical connection."); *Or. State Bar Pro. Liab. Fund v. Benfit*, 201 P.3d 936, 939 (Or. Ct. App. 2009) ("[T]he above definition of the phrase 'same or related claims' is not ambiguous or reasonably susceptible to more than one plausible meaning.  Indeed, the phrase is broadly defined and expressly encompasses a number of considerations that are clear on their face.").

-17-

requiring a "causal[]" connection or not defining the operative relatedness standard at all.[9]  App. Vol. 2 at 313-17 (collecting cases).

In sum, the Policy's language furnishes unambiguous, explicit guidance concerning the manner in which to determine whether **claims** arise out of **interrelated acts or omissions** and, under Oklahoma law, those unambiguous provisions control.

## III.   **REGARDLESS OF THE NUMBER OF AUDITS CHALLENGED, THE LENDER LAWSUITS ARE A SINGLE CLAIM BECAUSE THEY ARISE OUT OF THE SAME ACT OR OMISSION OR ACTS OR OMISSIONS THAT ARE _LOGICALLY CONNECTED_ BY _ANY_ COMMON FACT OR CIRCUMSTANCE.**

The district court correctly determined that Lenders' "claims arising from a given audit report are 'interrelated.'"  App. Vol. 2 at 446.  However, it erred in deciding that "claims arising from different audit reports are not 'interrelated.'"  _Id_.

As a threshold matter, the Policy defines **claim** to mean a demand, which "shall include the service of suit," against an **Insured**.  App. Vol. 1 at 78.  Under that definition, each Lender Lawsuit <u>in its entirety</u> is the **claim** against Auditor, regardless of the number of audit reports at issue within the lawsuit.  _See Westport Ins. Corp. v. Mylonas_, Civ. Action No. 14-5760, 2016 U.S. Dist. LEXIS 114867,

---

[9] In fact, the _Stauth_ court itself distinguished the "causally connected" language in the relevant policy there from more "specific definitions" available in the marketplace – including language more akin to that in Auditor's Policy – under which courts "have been much more willing to find acts to be 'interrelated.'" 1999 WL 420401, at *9.

\*16-17 (E.D. Pa. Aug. 25, 2016) (unpublished) (holding that single lawsuit involving several breaches of the standard of care that caused separate and distinct injuries was a single "claim," where policy defined "claim" to mean a "demand," including "service of suit" against an insured); *UBS Fin. Servs., Inc. of Puerto Rico v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019) (rejecting argument that lawsuits should be "divided into multiple fractions"); *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, No. GJH-14-00425, 2014 WL 5812316, at \*4 (D. Md. Nov. 7, 2014) (holding that a civil proceeding constituted a "claim"), *aff'd*, 814 F.3d 171 (4th Cir. 2016) (unpublished); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis*, 296 F.3d 336, 342 (5th Cir. 2002) (rejecting proposition that "one lawsuit" can qualify as two "civil proceedings"); *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 953 (7th Cir. 2020) ("a 'claim' taking the form of 'a civil proceeding commenced by the service of a complaint' spans the entire civil action, not just the legal theories and factual allegations in the complaint that commenced the action").

Even if a single lawsuit properly could be parsed into multiple **claims** under any circumstances, doing so on these facts entirely ignores the Policy's relatedness language, which dictates that **claims** arising out of the same acts or omissions, or acts or omissions that are logically connected by any common fact, circumstance, situation, transaction, event, advice or decision, shall be deemed a single **claim**.

Not only are Lenders' complaints related to each other (as the district court properly held), but *all* of the Audits at issue within each lawsuit also are logically connected to each other by any common fact or circumstance, such that the Lender Lawsuits properly are deemed a single **claim**.

A.    **Case law from within the Tenth Circuit supports a broad reading of the unambiguous interrelated claims provision, to include all claims sharing any common connection.**

The Lender Lawsuits are **interrelated claims** if they arise out of **interrelated acts or omissions**, *i.e.*, acts or omissions that are "logically" connected by *any* common fact, circumstance, situation, transaction, event, advice or decision.  App. Vol. 1 at 80 (Section I).  On its face, the Policy language requires merely that the claims at issue overlap; there need not exist perfect identity of facts or legal theories.  The test is one of minimal commonality, not complete congruence, and certainly not causation.

The Lender Lawsuits, both between and within themselves, easily involve acts or omissions that are "logically" connected by *any* common fact or circumstance, where:

- Each Lender Lawsuit is based on the same audits;

- Each Lender Lawsuit alleges the same allegedly negligent failure to identify the same ongoing "out of trust" loan scheme at the same entity (First Mortgage); and

- Each Lender Lawsuit alleges that the Lender relied on the same negligent audits in continuing to provide lending to First Mortgage during the same general time period.

In *Morden v. XL Specialty Insurance*, 903 F.3d 1145 (10th Cir. 2018) (applying Utah law), this Court held that a lawsuit brought by clients of an investment advisor (alleging improper investment advice in connection with four different ventures over a four-year period) and proceedings instituted by the Securities and Exchange Commission (alleging violation of federal securities laws in connection with the sale of stock in some, but not all, of the companies in which the clients invested) involved "Interrelated Wrongful Acts."  The claims-made financial services liability policy in *Morden* defined that term "broadly" to mean "Wrongful Acts which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events."  *Id*. at 1151.  Although the relevant investments and ventures were "quite varied in nature[,]" this Court determined that it sufficed that they "share[d] common threads" in order to find that they involved "Interrelated Wrongful Acts."  *Id*. at 1147.  According to this Court, the matters involved Interrelated Wrongful Acts because the Wrongful Acts at issue "were *committed by the same entity*…, against the same victims (the [plaintiffs] and *other clients*), *using the same techniques* (understating risk, overstating upside potential, and concealing financial interests

-21-

of the advisers), *during the same time frame* (2005-2009)." *Id*. at 1152 (italics added).

This Court's decision in *Morden* was overtly guided by its precedent in *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 (10th Cir. 2013) (applying New York law),[10] in which this Court determined that "minor variations in the [underlying] claims were inconsequential" in assessing relatedness. *Morden*, 903 F.3d at 1153. In *Brecek & Young*, this Court held that three separate arbitration proceedings arose from "interrelated wrongful acts," notwithstanding that they were brought by different claimants and asserted different claims, because all three proceedings shared a "sufficient factual nexus." *Id.* at 1238. Specifically, each of the matters included some allegations of churning or flipping of investment accounts in order to enrich broker/agents at the expense of account holders. The three proceedings involved *certain* of the same respondents; all of the alleged misconduct was alleged to have taken place during "*roughly*" the same time period (from the late 1990s to the mid-2000s); each of the claims alleged *some* of the same misconduct; and all of the claims alleged that the insured was vicariously liable for failing to supervise its brokers/agents. *See id*. (italics added). This Court rejected the argument that the policy's relatedness

---

[10] According to this Court in *Morden*, the decision in *Brecek & Young* "did not turn on any idiosyncrasy of New York law." 903 F.3d at 1153.

provisions must be "strictly and narrowly construed," noting that, because the policy defined the term "interrelated wrongful acts," there was "no justification for reading the term…narrowly at the expense of applying its plain language." *Id*. at 1239.

Likewise, in *Templeton v. Catlin Specialty Insurance Co.*, 612 F. Appx. 940 (10th Cir. 2015) (applying New York law), this Court applied the "broad" definition of Interrelated Wrongful Acts – which, akin to the definition in Auditor's Policy, required only that wrongful acts be similar or "connected by reason of *any* common fact, circumstance, situation, transaction, casualty, event, decision or policy" – as written, to uphold a liability insurer's denial of coverage under an "interrelated wrongful acts exclusion." *Id*. at 956, 957, 958, 960. The relevant exclusion applied where a claim involved "any Wrongful Act occurring on or after the Retroactive Date which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts." *Id*. at 945-46, 956. Notably, the FINRA arbitration award for which the insured sought coverage involved *two distinct sets* of risky securities that the insured had sold to clients, first in 2004 (the MedCap II Note) – before the Retroactive Date – and subsequently three years later in 2007 (the MedCap IV Note).

The district court determined on summary judgment that the sales of the distinct sets of securities were "interrelated wrongful acts," on the basis that

"[s]everal common facts connect [the insured's] wrongful acts in 2004 and 2007, as the acts involved the same clients…and investments in the same company." *Templeton v. Fehn*, No. 12-cv-00859-RPM, 2014 U.S. WL 2861832, at *7 (D. Colo. June 24, 2014) (unpublished).  The district court reasoned: "The Policy does not require that the acts be 'identical,' only 'interrelated.'" *Id*. at *8.  On appeal, this Court readily agreed, explicitly cautioning that, although there may be dissimilarities among wrongful acts, "dissimilarities…do not show the wrongful acts were not 'similar' or 'connected.'" 612 F. Appx. at 959.  According to this Court, it sufficed that the claims regarding the different securities transactions at issue:

> alleged liability based on the same conduct by [the insured] – his failure to disclose the same material facts about MedCap Holdings, his failure to investigate the products he sold, and his failure to conduct a proper suitability analysis of the [clients] before selling them the MedCap II and MedCap IV notes.

612 F. Appx. at 958.

Precisely as this Court contemplated in *Templeton*, here, Auditor's liability (to both Lenders, in connection with all of the Audits) is based on the same conduct – the failure to identify the singular ongoing "out of trust" scheme at First Mortgage.  And, as in *Templeton*, it should make no difference to the relatedness analysis – which asks whether acts or omissions are logically connected by *any* common fact or circumstance – that the conduct occurred more than once.  *See*

*also Berry & Murphy, P.C.*, 586 F.3d at 812 (10th Cir. 2009) (Colorado law)

(holding that demand letter issued to one insured and malpractice lawsuit instituted

against two insureds were "logically connected") (citing *Mohrlang*, 2009 WL

321706, at *11); *Ciber, Inc. v. ACE Am. Ins. Co.*, 261 F. Supp. 3d 1119, 1124,

1127 (D. Colo. 2017) (lawsuits involved "interrelated wrongful acts"

notwithstanding that they were filed two years apart, by different plaintiffs,

alleging different legal theories, where policy "expansively" defined "interrelated

wrongful acts" as "all wrongful acts that have as a common nexus any fact,

circumstance, situation, event, transaction, cause or series of related facts,

circumstances, situations, events, transactions or causes[,]" and lawsuits involved a

"single scheme"); *Starr Indem. & Liab. Co. v. MonaVie, Inc.*, No. 2:14-cv-00395-

DN, 2019 WL 1227930, at *12 (D. Utah March 15, 2019) (unpublished)

(consumer class action lawsuits filed on behalf of different class members two

years apart alleged "related Wrongful Acts" where the lawsuits "contain the

common threads of a multilevel marketing scheme that involved

misrepresentations about the health benefits of [the insured's] juice products").

      **B.**    **Case law nationwide holds that the focus of broad definitions of "related claims" or "interrelated claims" like that here must be on whether the claims have any logical or causal connection, not on any differences between them.**

      The case law from within the Tenth Circuit is entirely consistent with a large

body of "related claims" case law nationwide, where the courts' analysis

consistently focuses on the commonalities between claims, rather than the differences. As the Eleventh Circuit aptly observed in construing the same policy language at issue here, the relevant inquiry "is not whether there are any differences between the…claims" but "whether the claims are logically or causally connected by 'any' common fact, circumstance, etc." *Belcher*, 709 F. Appx. at 609.[11]

The main takeaway from the abundant "related claims" case law is this: courts finding a common factor generally will deem claims to be related, even where (unlike here) there may also be significant differences between the claims. Thus, courts routinely deem claims to be related even where there are numerous claimants who are differently situated and to whom the insured owed separate duties; where the insured committed multiple errors; where the claimants suffered distinct and unique injuries; and where the claims span a long duration of time.

---

[11] *Belcher* involved numerous lawsuits and demands made against a pharmacy and its pharmacist (the insureds) by claimants who, months apart, had suffered injuries after having received intraocular injections of two different drugs that the insureds had repackaged into single use vials. The claimants argued that their claims were not related because they received two different types of medication; their syringes were prepared on different dates; they received their injections on different dates; and they were infected with at least two different strains of bacteria. *See id*. According to the court: "That line of argument misunderstands the inquiry." *Id*. In light of the "myriad shared facts, circumstances, and decisions that logically connect the defendants' claims," all generally involving the repackaging of eye medication under unsanitary conditions, the court held the claims were related and a $1 million single claim limit applied. *Id*. at 610.

*See, e.g., Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983, 990 (8th Cir. 2014) (holding that four claims by four clients against an investment advisor for negligent advice about different investment products in varying amounts over a multi-year period constituted related claims where the advisor made repetitive mistakes in the performance of her professional services; concluding that, "[a]lthough [the insured] made different alleged misstatements, omissions, and promises on different dates to each [claimant], there nonetheless exists a logical connection between her wrongful acts"); *Wendt*, 205 F.3d 1258 (finding it immaterial that there were discrete injuries suffered by a number of different claimants to whom the insured owed different duties, where the injuries flowed from repetition of the same or similar wrongful acts through a consistent course of conduct or business practice); *Gregory v. Home Ins. Co.*, 876 F.2d 602 (7th Cir. 1989) (concluding that claims by an insured attorney's client and claims by third parties, which involved the insured's distinct mistaken tax and securities advice, were "related" under a policy that did not define the term; concluding that "relatedness" included both logical and causal connections); *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely L. Corp.*, 162 F. Supp. 3d 1068, 1079 (C.D. Cal. 2016), *aff'd,* 708 F. Appx. 374 (9th Cir. 2017) (seven actions by different parties for misrepresentations regarding inflated purchase prices and inflated fees for twenty-three different real estate investments occurring over nearly six years constituted "related" claims

because they involved "allegations of similar or identical acts of wrongdoing which were part of a general course of conduct"); *Direct Gen. Ins. Co. v. Hous. Cas. Co.*, 139 F. Supp. 3d 1306 (S.D. Fla. 2015), *aff'd*, 661 F. Appx. 980 (11th Cir. 2016) (holding that *over 70,000* claims were related, even where policy did not define relatedness, because each arose out of the common practice of insured continuing to use certain payment reimbursement technology after a change in the applicable law); *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693 (E.D. Wis. 2005) (holding that thirty-nine separate lawsuits by different plaintiffs were "Related Claims" because they arose from logically and causally related wrongful acts concerning insured's common underwriting practice over a multi-year period); *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013 (DAB), 2014 WL 1876984, at *5 (S.D.N.Y. May 8, 2014) (unpublished) ("To demonstrate a sufficient factual nexus, the claims need not 'involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief.'") (internal citation omitted).

   In *Camico Mutual Insurance Co. v. Rogozinski,* No. 3:10-cv-762-J-32MCR, 2012 WL 4052090 (M.D. Fla. Sept. 13, 2012) (unpublished), the district court for the Middle District of Florida held that three claimants' separate claims against the same accountant constituted a single related claim, where they were based on the same alleged errors, even where the errors occurred over a span of multiple years.

The accountant's professional liability policy in that case used language nearly identical to that at issue here – namely, "acts, errors or omissions…that are logically or causally connected by any common fact(s), circumstances, situation, transaction(s), event(s) advice or decisions." *Id.* at \*6 (italics omitted). The insured accounting firm repeatedly made the same error for several years in a row in its preparation of tax returns of three brothers who ran a joint business together, resulting in multiple claims against the accounting firm. Noting the breadth of the policy's relatedness language, the court held that all of the claims were related, explaining:

> [A]ll harm arising from [the accounting firm's] *multiple breaches* can be attributed to one fact: in 1989 [the accounting firm] did not employ the proper care to discover whether the [business's] royalty income should be classified as capital gains. All injuries or acts that occurred after [the accounting firm's] initial mistreatment of the royalty income constitute a *series of errors alike in kind and injury*. Thus, [the accounting firm's] acts are logically and causally connected, i.e. the *same accountant* made the *same error* for *several years in a row* concerning a joint business of the three brothers, resulting in errors in each of their individual tax returns. Under the language of the Policy, then, the [claimants] are subject to the per claim limit.

*Id.* at \*8 (italics added).

The facts here square seamlessly with those in *Rogozinski*. Each Lender sought relief from the same accountant (Auditor), who made the same error (failure to identify the "out of trust" scheme), more than one time, concerning the same business (First Mortgage).

-29-

**C.     The district court's analysis failed to accord the policy language its plain meaning.**

Without addressing this extensive body of well-developed, on-point case law nationwide, the district court focused exclusively on (and misapplied) a single, non-binding, unpublished opinion (which was affirmed by this Court in a short, unpublished opinion) that is easily distinguishable on its facts.  App. Vol. 2 at 440-41.  Specifically, the district court determined that, under *Mohrlang*, the Audits on which Lenders relied – each of which involved the same mistake, repeated annually – somehow bore no logical connection to one another because one audit did not "attend or flow from the other in an inevitable or predictable way."  App. Vol. 2 at 441.

*Mohrlang* applied relatedness language substantially the same as that here to a factually distinguishable context, ultimately determining (under Colorado law) that two categories of legal malpractice claims under review involved distinct "sets" of acts or omissions that were neither logically nor causally connected to each other.  Specifically, *Mohrlang* considered whether the following two categories of claims were "related claims": (1) claims brought on behalf of the insured lawyers' multiple clients involving the lawyer's alleged negligence in negotiating and approving the structure of the clients' sales of stock in their family business ("MMI"), and (2) a claim brought on behalf of one client involving the lawyer's alleged breach of fiduciary duties in causing that client to release a

-30-

promissory note and deed of trust against MMI while improperly representing opposing sides in the transaction. *See Mohrlang*, 2009 WL 321706, at *6-8. On those facts, the district court separated the clients' claims into two distinct "sets of the Insured's acts or omissions" – (1) the "imprudent structuring of the sale" of stock in MMI, and (2) the "violation of fiduciary duties" in connection with the release. *Id*. at *10. And, on those facts, the court determined that those two "sets" of acts or omissions were not "logically connected" to each other because they did not "attend or flow from the other in an inevitable or predictable way." *Id*. at *11.

Notably, the court in *Mohrlang* determined that <u>all</u> claims asserted on behalf of <u>all</u> of the insured's clients involving each <u>set</u> of acts or omissions relating to the structuring of the MMI sale were properly deemed "related claims." *See id*. at *13 and n.14. In other words, beyond separating the insured's conduct into two "sets" of alleged wrongdoing, the court did not then further parse either set into multiple claims based on the number of acts or omissions involved.[12] Rather, the court implicitly acknowledged that the acts or omissions *within* each set were logically connected to each other (or, in the court's parlance, "attend[ing] or flow[ing] from

---

[12] In connection with the MMI sale, for example, the insured allegedly negotiated numerous documents, the various "shortcomings" of which effectively provided the insured's clients with insufficient security as well as an inability to collect on or revoke the sale of stock. *See id*. at *1. Notwithstanding the multitude of acts at issue, the court related all "breaches of professional duties related to the sale of…MMI stock." *See id*. at n.14.

the other in an inevitable or predictable way"), holding only that acts or omissions *between* the two sets were not.  *See id*. at *11.

Under the rationale of *Mohrlang*, the Lender Lawsuits – each of which challenges the *same set* of acts or omissions (*i.e.*, negligently prepared audits that failed to uncover the "out of trust" scheme at First Mortgage) – are "logically connected," both between and within themselves.  Put another way, acts involving Auditor's repetition of the *same* mistake in *serial* Audits *do* in fact "attend or flow from the other in an inevitable or predictable way" precisely because they result from the Auditor making the same mistake in performing the same function three consecutive years.  That is, in substance, what the *Rogozinski* court effectively concluded by holding that claims arising from an accountant making the same type and kind of error multiple times were related.  *See Rogozinski,* 2012 WL 4052090, at *8; Argument, *supra*, Section III.B (pp. 28-29).

In any event, in addition to supporting Continental's position and being readily distinguishable on its facts, *Mohrlang* was decided before most of the "related claims" decisions of this Court and other courts nationwide holding that policy language like that here must be very broadly construed.  As explained above, subsequent decisions of this Court and others nationwide teach that, in determining whether claims are logically or causally connected by any common fact or circumstance, the proper focus is on whether the claims have any

meaningful commonality, not whether there are differences. *See* Argument, *supra*, Section III.A-B. To the extent *Mohrlang* can be read to require any greater connection, it is out of step with an overwhelming body of subsequent, on-point law from this Court and other courts nationwide.

The bottom line is that the plain meaning of the language of the Policy and extensive judicial authority compel the conclusion that the undeniable commonalities both between and within the Lender Lawsuits place them comfortably within the definition of **interrelated claims**, such that they are subject to a single $1 million per **claim** limit of liability. Any reasonable lay person, confronted with these essentially identical claims by two lenders filed within days of each other against the same auditor, involving its audits of the same company, all of which audits failed to uncover the same ongoing "out of trust" loan scheme, would recognize that the acts alleged by Lenders are "logically connected." Common sense compels that conclusion on these facts.

## **<u>CONCLUSION</u>**

The Court should reverse the judgment of the district court and enter judgment in favor of Continental declaring that (1) the Lender Lawsuits constitute a single **claim** to which a single $1,000,000 per **claim** limit of liability applies; and (2) because Continental has fully paid the applicable $1,000,000 limit, Continental has no further obligations with respect to the Lender Lawsuits.

-33-

# ORAL ARGUMENT STATEMENT

Continental requests oral argument because the decision below presents a significant issue of insurance contract interpretation. The decision below conflicts with decisions of this Court and other courts around the country as to how the same or substantially the same policy language should be interpreted. Oral argument would aid the decisional process by allowing counsel an opportunity to explain their positions further and to respond to questions from the Court.

Dated: June 29, 2022                    Respectfully submitted,

                                        /s/ Richard A. Simpson
                                        Richard A. Simpson
                                        rsimpson@wiley.law
                                        Pamela L. Signorello
                                        psignorello@wiley.law
                                        WILEY REIN LLP
                                        2050 M Street NW
                                        Washington, DC 20036
                                        Telephone – (202) 719-7000
                                        Fax – (202) 719-7049

                                        Roger N. Butler, Jr.
                                        SECREST HILL BUTLER & SECREST
                                        7134 S. Yale
                                        Suite 900
                                        Tulsa, OK  74136
                                        rbutler@secresthill.com
                                        Telephone – (918) 494-5905
                                        Fax – (918) 494-2847

                                        *Attorneys for Appellant/Cross-Appellee*
                                        *Continental Casualty Company*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1.      This document complies with the word limit of Fed. R. App. P.

28.1(e)(2)(A)(i) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f) and 10th Cir. R. 32(B), this document contains 8,111 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Microsoft Office 365 (Build 13801.21106 Version 2102) in

Times New Roman font size 14.

Dated: June 29, 2022

*/s/* Richard A. Simpson
Richard A. Simpson
WILEY REIN LLP
2050 M Street NW
Washington, DC  20036
rsimpson@wiley.law
Telephone – (202) 719-7000
Fax – (202) 719-7049

*Attorney for Appellant/Cross-Appellee*
*Continental Casualty Company*

# ADDENDUM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AMERICAN SOUTHWEST MORTGAGE CORPORATION and AMERICAN SOUTHWEST MORTGAGE FUNDING CORPORATION, <br><br>    Plaintiffs, <br><br> v. <br><br> CONTINENTAL CASUALTY COMPANY, <br><br>    Defendant. | ) ) ) ) ) ) ) ) Case No.  CIV-20-00422-PRW ) ) ) ) |

## ORDER

Before the Court are Defendant's "Motion for Summary Judgment" (Dkt. 30) and Plaintiffs' "Motion for Summary Judgment on Stipulated Facts" (Dkt. 31). For the reasons set forth below, the Court **DENIES** Defendant's "Motion for Summary Judgment" (Dkt. 30) and **GRANTS IN PART** Plaintiffs' "Motion for Summary Judgment on Stipulated Facts" (Dkt. 31).

### Background

The facts as stipulated to by the parties for purposes of their competing summary judgment motions are as follows. *See* Stipulated Facts (Dkt. 29, Ex. 1). Robison Gary Johnson & Associates, PPLC ("Auditor") audited the financial statements of First Mortgage Corporation ("FMC") and compiled an audit report every year for the years 2014, 2015, and 2016.[1] *See id.* ¶ 2. American Southwest Mortgage Corporation ("ASMC")

---

[1] ASMFC and ASMC stipulated for purposes of these summary judgment motions that there were three audit reports. *See* Stipulated Facts (Dkt. 29, Ex. 1) ¶ 2 ("Robison

**Add.1**

and American Southwest Mortgage Funding Corporation ("ASMFC") separately extended lines of credit to FMC based on those reports. *See id.* ¶¶ 5, 7, 13.

But there was a critical error in the reports: in each, Auditor reported that all of ASMC's and ASMFC's loans to FMC were "collateralized by mortgage loans"—i.e., that the loans were secured. *Id.* ¶¶ 6, 12. In reality, they were not. *See id.* ¶¶ 4, 6, 12. And had ASMC and ASMFC known that some of their loans were unsecured, they could and would have terminated their respective lines of credit much earlier, avoiding millions of dollars in losses. *See id.* ¶¶ 4, 6, 12.

On March 20 and 22, 2018, respectively, ASMFC and ASMC sued Auditor for professional negligence in connection with these erroneous audit reports. *See id.* ¶¶ 8, 14; AMSC Pet. (Dkt. 29, Ex. 5); ASMFC Pet. (Dkt. 29, Ex. 9). Those lawsuits yielded two consent judgments, one in favor of ASMC against Auditor for $1,500,000.00 and another in favor of ASMFC against Auditor for $1,500,000.00. *See* Stipulated Facts (Dkt. 29, Ex. 1) ¶¶ 10, 16.

At all relevant times, Continental Casualty Company ("Continental") insured Auditor under Accountants Professional Liability Policy Number 128567086 (the

---

performed annual audit reports on the financial statements of First Mortgage Corporation ('FMC') for the three years ending December 31, 2014, 2015, and 2016."). However, in the course of briefing these motions, they recanted: their injuries, they argue, "were caused by the professional auditors' negligence . . . in their performance of two separate audits of First Mortgage Company ('FMC') in 2014 and 2016." Pls.' Mot. for Summ. J. on Stipulated Facts (Dkt. 31) at 6. The difference—two audits or three—is immaterial for the first part of the analysis below but is material for the later portion. Accordingly, the Court proceeds under the stipulated facts for the first part of its analysis (i.e., where this difference is immaterial) but addresses the dispute later on (i.e., where it is material).

**Add.2**

"Policy"). *See id.* ¶ 1. The Policy provided coverage for professional negligence claims like those at issue:

> [Continental agrees to] pay on [Auditor's] behalf all sums in excess of the deductible, up to our limits of liability, that you become legally obligated to pay as damages and claim expenses . . . by reason of an act or omission in the performance of professional services by you or by any person for whom you are legally liable[.]

*Id.* Critically for present purposes, the Policy capped coverage at $1,000,000.00 per claim and $3,000,000.00 in aggregate. *See id.*

Continental stipulates that the consent judgments against Auditor in favor of ASMC and ASMFC are for "acts or omissions in the performance of professional services" covered under the Policy. *See id.* ¶ 20. And Auditor, in turn, assigned its entitlement to recovery under the Policy to ASMC and ASMFC. *See id.* ¶ 23. In other words, Continental agrees that it is liable for ASMC and ASMFC's claims and, by a subsequent agreement, will pay ASMC and ASMFC to the extent of its liability under the Policy.

That brings us to the matter at hand. Continental contends that all of ASMC and ASMFC's claims are "interrelated claims," as the Policy defines the phrase, and therefore are subject to the Policy's single-claim limit of $1,000,000.00. *See id.* ¶ 21. ASMC and ASMFC disagree. *See id.* ¶ 22. In their view, each inaccurate audit report was a distinct instance of negligence that both independently relied upon to their detriment and, as such, the aggregate limit of $3,000,000.00 applies. *See id.*

ASMC and ASMFC ("Plaintiffs") brought this action for declaratory relief against Continental ("Defendant," and together with Plaintiffs, the "Parties"), and Continental subsequently brought a counterclaim for declaratory relief against ASMC and ASMFC, to

**Add.3**

resolve this narrow question of contract interpretation on the stipulated facts above. *See* Pls.' Compl. for Declaratory J. (Dkt. 1) at 12; Def.'s Answer, Affirmative Defenses and Countercl. (Dkt. 12) at 12; Am. Joint Stipulation (Dkt. 29) at 2 (providing that the coverage issue would be the sole issue presented to the federal district court and that the parties would present that issue based on stipulated facts). Now, with Continental's "Motion for Summary Judgment" (Dkt. 30) and ASMC and ASMFC's "Motion for Summary Judgment on Stipulated Facts" (Dkt. 31) fully briefed and before the Court, the question of whether the per-claim limit of $1,000,000.00 or the aggregate limit of $3,000,000.00 applies is ripe for resolution.

## *Applicable Law*

### I.    *Standard of Review*

Federal Rule of Civil Procedure 56(a) requires "[t]he court [to] grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine dispute for trial before the fact-finder.[2] The movant bears the initial burden of demonstrating the absence of a genuine, material dispute and an entitlement to judgment.[3] A fact is "material" if, under the

---

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015).

[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**Add.4**

substantive law, it is essential to the proper disposition of the claim.[4] A dispute is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[5]

If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing . . . that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact."[6] The nonmovant does not meet its burden by "simply show[ing] there is some metaphysical doubt as to the material facts"[7] or by merely theorizing a plausible scenario in support of its claims. Rather, "'the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[8] If there is a

---

[4] *Anderson*, 477 U.S. at 248; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[5] *Anderson*, 477 U.S. at 248; *Adler*, 144 F.3d at 670.

[6] Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006).

[7] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995)).

[8] *Neustrom*, 156 F.3d at 1066 (quoting *Anderson*, 477 U.S. at 251–52; *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993)).

**Add.5**

genuine dispute as to some material fact, the district court must consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party.[9]

II.    *Principles of Contract Interpretation*

The Parties agree that Oklahoma law governs this contract dispute, *see* Pls.' Mot. for Summ. J. on Stipulated Facts (Dkt. 31) at 18; Def.'s Mot. for Summ. J. (Dkt. 30) at 11, so the Court applies Oklahoma law.[10] Under Oklahoma law, "insurance policies," like the one at issue here, "are contracts interpreted as a matter of law."[11] "If the terms of a[n insurance] contract are unambiguous, clear[,] and consistent, they are accepted in their plain and ordinary sense" and are "the only legitimate evidence of what the parties [to that insurance contract] intended."[12] The Court "will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision."[13]

---

[9] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

[10] *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

[11] *Atain Speciality Ins. Co. v. Tribal Const. Co.*, 912 F. Supp. 2d 1260, 1268 (W.D. Okla. 2012) (citing *BP America, Inc. v. State Auto Property & Cas. Ins. Co.*, 148 P.3d 832, 835 (Okla. 2005)).

[12] *S. Corr. Sys., Inc. v. Union City Pub. Sch.*, 2002 OK 93, ¶ 14, 64 P.3d 1083, 1088–89 (citations omitted).

[13] *Id.* ¶ 14, 64 P.3d at 1089.

**Add.6**

### *Discussion*

I.     *The Relevant Provisions of the Policy*

According to the Parties, the question presented is whether the liability cap under the Policy for present purposes is the per-claim limit of $1,000,000.00 or the aggregate limit of $3,000,000.00. The answer to that question necessarily begins with the interpretation of three cross-referencing provisions of the Policy, namely those defining "claims," "interrelated claims," and "interrelated acts or omissions," in light of the aforementioned coverage limits.

The Policy has a per-**claim** limit of $1,000,000.00 and an aggregate limit of $3,000,000.00. *See* Policy (Dkt. 29, Ex. 2) at 1, 32. A "**claim**," in relevant part, "means a demand received by you for money or services naming you and alleging an act or omission . . . in the rendering of professional services. A demand shall include the service of suit or the institution of arbitration proceedings against you." *Id.* at 24 (emphasis in original).

Critically for present purposes, "**interrelated claims**, whenever made, [are] considered a single **claim**" and are therefore subject to the per-claim limit of $1,000,000.00. *Id.* at 32 (emphasis in original). The phrase "**interrelated claims**" means "all **claims** [1] arising out of a single act or omission or [2] arising out of **interrelated acts or omissions** in the rendering of professional services." *Id.* at 26 (emphasis in original). And the phrase "**interrelated acts or omissions**," in turn, "mean[s] all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *Id.*

**Add.7**

(emphasis in original) (emphasis omitted).

The meaning of "logically . . . connected" in this last definition was the central focus of the Parties' respective briefs.[14] Plaintiffs argue for a very narrow interpretation of this language; Defendant for a broad one.

## II.    Tenth Circuit Precedent

This is not this circuit's first run-in with this "logically . . . connected" language. In *Professional Solutions Insurance Company v. Mohrlang*, another district court in this circuit dealt with a similar situation and substantively indistinguishable language: the insurance policy had a per-claim limit of $500,000.00 and an aggregate limit of $1,000,000.00; the insurance policy provided that "related claims" are subject to the per-claim limit of $500,000.00; another provision of the insurance policy defined "related claims" as "claims arising out of a single act or omission or arising out of related acts or omissions in the rendering of professional services," where "related acts or omissions" meant "all acts or omissions in the rendering of professional services that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision"; and the insurer argued that the claims against the insured were "related" such that the single-claim limit applied.[15] The district court held that the "logically . . . connected" language was unambiguous and, as a result, gave the phrase its

---

[14] Plaintiffs and Defendant focus exclusively on the "logically . . . connected" language; neither argues that the claims are or are not "causally connected." Accordingly, the Court does not address that possibility.

[15] *Pro. Sols. Ins. Co. v. Mohrland*, 2009 WL 321706, at **3–4 (D. Colo. Feb. 10, 2009) (emphasis omitted), *aff'd*, 363 F. App'x 650 (10th Cir. 2010).

**Add.8**

ordinary meaning: for two claims to be "logically . . . connected," it said, "one must attend or flow from the other in an inevitable or predictable way."[16] It found that the claims in that case were not "logically . . . connected."[17]

On appeal, the Tenth Circuit affirmed.[18] In a short opinion authored by then-Judge Gorsuch, the Tenth Circuit lauded the district court's decision, calling it "cogent and well-reasoned" and "detailed, accurate, and complete," and then adopted the reasoning therein.[19] While the Tenth Circuit's decision in this particular case is not binding precedent,[20] the Court is similarly persuaded by the district court's reasoning in *Mohrlang*. As such, the Court finds that for two acts or omissions to be "logically . . . connected" under the Policy, one act or omission must attend or flow from the other in an inevitable or predictable way.

### III.    *Analysis*

The dispositive question of whether the "claims" are "interrelated," then, turns on whether the "claims" at issue (1) "aris[e] out of a single act or omission . . . in the rendering of professional services" or (2) arise out of acts or omissions that attend or flow one from

---

[16] *Id.* at **8–9, 11.

[17] *See id.* at *11.

[18] *See Pro. Sols. Ins. Co. v. Mohrlang*, 363 F. App'x 650 (10th Cir. 2010).

[19] *See id.* at 652 ("[W]e agree with the district court's cogent and well-reasoned analysis. The analysis was detailed, accurate, and complete, and we see no reason to repeat it here. Accordingly, for substantially the same reasons as articulated by the district court in its order dated February 10, 2009, we AFFIRM."); *see also Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 811–12 (10th Cir. 2009) (discussing, adopting, and applying the test propagated by the district court in *Mohrlang*).

[20] *See id.* at 651 n.* ("This order and judgment is not binding precedent . . . . It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.")

**Add.9**

the other in an inevitable or predictable way.[21] If all the potential claims do not fall within one of these two categories, the Court will then also need to determine the number of discrete "claims" in order to arrive at the total coverage limit in play.

   a.   The Potential "Claims"

As a preliminary matter, the Court must identify the potential "claims" before determining whether they are "interrelated." A "claim" under the Policy requires (1) "a demand received by [the insured] for money or services naming [the insured]" and (2) alleging an "act or omission" by the insured "in the rendering of professional services." Policy (Dkt. 29, Ex. 2) at 24 (emphasis omitted). The latter requirement is supplied by the failure to identify the absence of security interests in each of the three audit reports. *See* Stipulated Facts (Dkt. 29, Ex. 1) ¶¶ 6, 22. And the former is satisfied by the lawsuits brought by ASMC and ASMFC concerning these erroneous audit reports. *See* Policy (Dkt. 29, Ex. 2) at 24 ("A demand shall include the service of suit or the institution of arbitration proceedings against [the insured]."); ASMC Pet. (Dkt. 29, Ex. 5); ASMFC Pet. (Dkt. 29, Ex. 9). So, at a first cut, there are six unique potential "claims" under the stipulated facts: three by ASMC against Auditor, with one for each negligently omissive audit report; and

---

[21] There are many moving parts to this analysis, so the Court provides a brief recap to reorient the reader: the phrase "**interrelated claims**" means "all **claims** arising out of a single act or omission or arising out of **interrelated acts or omissions** in the rendering of professional services." Policy (Dkt. 29, Ex. 2) at 26 (emphasis in original) (emphasis omitted). And the phrase "**interrelated acts or omissions**," in turn, "mean[s] all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *Id.* (emphasis in original) (emphasis omitted). The Court has now defined "logically . . . connected" as attending or flowing one from the other in an inevitable or predictable way.

**Add.10**

three by ASMFC against Auditor, again with one for each negligently omissive audit report.[22]

### b. *"Interrelated Claims" as "All Claims Arising Out of a Single Act or Omission"*

The first of the two disjunctive possibilities for the phrase "interrelated claims" trims this list from six to three potential "claims" for purposes of determining the applicable coverage limit. The phrase "**interrelated claims**" includes "all **claims** arising out of a single act or omission . . . in the rendering of professional services." Policy (Dkt. 29, Ex. 2) at 26 (emphasis in original) (emphasis omitted). In this case, under the stipulated facts, there were three distinct omissions—one in each of the audit reports. As such, there can be no more than three distinct claims for purposes of the liability cap. Put differently, all "claims" stemming from a given audit report omission are a single claim for purposes of

---

[22] This conclusion assumes that one "demand" can support more than one "claim." The Court finds that assumption appropriate for three reasons. First, there is no clear language in the Policy to the contrary. Second, the bounding principle in this regard—i.e., as to whether there are one or multiple "claims"—is supplied elsewhere, by provisions defining "interrelated claims" and requiring that a claim stem from a "single act or omission." Third, if that premise is not true (i.e., if a single demand *cannot* support multiple "claims"), absurd results would abound. For example, if that premise is not true, and a single "demand" cannot support more than one "claim," then ASMFC and ASMC could sidestep the restriction simply by sending two separate demand letters or filing two separate lawsuits at the same time, one relating to the 2014 audit report and the other relating to the 2016 audit report, even though it would have only one "claim" if it sent only one letter or filed only one lawsuit relating to both the 2014 and 2016 audit reports. Such an absurd, formalistic interpretation cannot be correct.

**Add.11**

determining the applicable coverage limit.[23]

> ### c. *"Interrelated Claims" as Acts or Omissions That Attend or Flow From One Another in an Inevitable or Predictable Way*

This leaves the central question presented and briefed by the Parties: whether the omissions from the 2014, 2015, and 2016 audit reports are "interrelated," which the Court has determined depends on whether these omissions attend or flow one from the other in an inevitable or predictable way. The Court answers that question in the negative.

It is true that the omission from each audit report was the same. But there is no indication in the stipulated facts that any earlier omission regarding the secured status of the loans portended a later omission of that information. And that is consistent with the very nature of an audit: the whole purpose is to independently evaluate anew the veracity of a particular financial statement.[24] In other words, each audit is a fresh and focused inquiry uninfluenced by other, earlier audits.[25] Because these audits were discrete, siloed

---

[23] In practical terms, this means that when ASMFC and ASMC each assert claims for professional negligence stemming from the omission from the 2014 audit report, for example, their two claims are "interrelated" and therefore subject to the per-claim cap of $1,000,000.00.

[24] *See Audit,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("A formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards."); *Audit Report,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("An independent auditor's written statement, usu. accompanying a company's financial statement, expressing the auditor's opinion of the accuracy of the company's financial condition as set forth in the financial statement."); *see also* Independent Auditors' Report (Dkt. 29, Ex. 3) at 3 ("Our responsibility [as auditor] is to express an opinion on *these* financial statements based on our audit.") (emp. added).

[25] Now, that is not to say that similar omissions in separate audits can never be "interrelated." If those omissions were both the product of a flawed form document, for example, then there would be a good argument that the later audit omission predictably followed the earlier audit omission.

12

**Add.12**

efforts, the omissions made in each, though similar, are not connected in an inevitable or predictable way. As such, the "claims" arising from the serial omissions from the audit report are not "interrelated," and are therefore not subject to the per-claim of $1,000,000.00.

### d. The Applicable Damage Cap

That brings the us to the final issue. In the stipulated facts, the Parties agree that there were three audit reports. *See* Stipulated Facts (Dkt. 29, Ex. 1) ¶ 2 ("Robison performed annual audit reports on the financial statements of First Mortgage Corporation ('FMC') for the three years ending December 31, 2014, 2015, and 2016."). But in briefing the instant motions, ASMC and ASMFC have backtracked: their injuries, they now contend, "were caused by the professional auditors' negligence . . . in their performance of *two* separate audits of First Mortgage Company ('FMC') in 2014 and 2016." Pls.' Mot. for Summ. J. on Stipulated Facts (Dkt. 31) at 6 (emphasis added); *see also* Def.'s Opp'n to Pls.' Mot. for Summ. J. (Dkt. 33) at 6–7 n.3 (noting the inconsistency). This fact, then, is in dispute.

And it is material too. If there were two audit reports (i.e., two discrete, predicate omissions), then there were two "claims" for purposes of the coverage limit, yielding a cap of $2,000,000.00. *See supra* Section III(a)–(b). But if there were three audit reports (i.e., three discrete, predicate omissions), then the full aggregate limit of $3,000,000.00 is in play.

The Court therefore orders Continental, in light of the foregoing, to declare whether it agrees that there were two erroneous audit reports, not three. And if Continental does

concede that fact, the Court orders ASMC and ASMFC to show cause as to why it should not credit its own contention and the exhibit compiling the audit reports, *see* Audit Reports (Dkt. 29, Ex. 3) at 1, 30 (showing only two audit reports), and conclude that there were only two erroneous audit reports.

### *Conclusion*

For the reasons set forth above, the Court concludes that ASMC and ASMFC's claims arising from a given audit report are "interrelated," while claims arising from different audit reports are not "interrelated." However, because there is a dispute of material fact as to the number of audit reports, the Court cannot determine whether the liability limit under the Policy is $2,000,000.00 or $3,000,000.00. Accordingly, to resolve that dispute of material fact, the Court directs Continental to declare whether it agrees that there were two erroneous audit reports and, if it does, also directs ASMC and ASMFC to show cause as to why the Court should not conclude that there were only two erroneous audit reports.

**IT IS SO ORDERED** this 25th day of August 2021.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

**Add.14**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

AMERICAN SOUTHWEST MORTGAGE )
CORP., and AMERICAN SOUTHWEST )
MORTGAGE FUNDING CORP., )
 )
            Plaintiffs, )
 )
v. )      Case No. CIV-20-00422-PRW
 )
CONTINENTAL CASUALTY )
COMPANY, )
 )
            Defendant. )

## <u>ORDER</u>

The question previously before the Court was whether claims arising out of injuries caused by sequential erroneous audit reports were "interrelated," for purposes of determining the liability limit for an insurance policy issued by Defendant. The Court granted summary judgment in favor of Plaintiffs, holding that the claims from both Plaintiffs as to the audit report from a given year are interrelated, but the claims arising out of audit reports from different years are not interrelated.

In the course of briefing, a factual question arose. Both parties stipulated to the facts that were to govern the summary judgment inquiry. These stipulated facts included the stipulation that there were *three* erroneous audits: the 2014 audit, the 2015 audit, and the 2016 audit. However, throughout the summary judgment filings, Plaintiffs consistently stated that there were only *two* erroneous audits: the 2014 audit, and the 2016 audit. The Court therefore directed the parties to file additional briefing to resolve this newly-disputed

1

**Add.15**

fact. Defendant argued that Plaintiffs had specifically advanced and relied on the fact of only two erroneous reports in their summary judgment arguments, so any arguments to the contrary should be waived. Plaintiffs responded that the waiver argument applies only to subsequent arguments, not subsequent facts.

It is true, as Plaintiffs cite, that "[g]enerally, on motions for summary judgment, courts regard stipulations of fact as admissions of the parties that are conclusive without further evidentiary support in the record."[1] Yet Plaintiffs omit the following sentence from that authority: "Adherence to stipulated facts, however, is not categorical."[2] The Court may always relieve a party from a stipulation "that might work injustice."[3] In making this determination, the Court may consider "[t]he stage at which a party requests relief" and whether there are "overriding . . . policy considerations that compel granting or denying such relief."[4]

In effect, Defendant is now requesting post-judgment relief from the stipulated fact of three erroneous reports. The Court finds that good cause exists to grant relief from that stipulation in order to prevent manifest injustice.[5]

Throughout the summary judgment filings, Plaintiffs discussed the "fact" of two erroneous reports no fewer than seventeen times. Plaintiffs repeatedly asserted that the

---

[1] *In re Durability, Inc.*, 212 F.3d 551, 555 (10th Cir. 2000) (citing *Stubblefield v. Johnson-Fagg, Inc.*, 379 F.2d 270, 272 (10th Cir. 1967)).

[2] *Id.*

[3] *Id.* (quoting *Westinghouse Elec. Corp. v. Adams*, 579 F.2d 899, 902 (10th Cir. 1978)).

[4] *Id.* at 556.

[5] Fed. R. Civ. P. 16.

**Add.16**

erroneous reports only occurred in 2014 and 2016, going so far as to claim that the audits were performed bi-annually rather than every year. Plaintiffs even directly repudiated the stipulated facts, claiming "the stipulations incorrectly stated that the audits were conducted annually when in fact they were conducted in two year increments."[6]

Plaintiffs explicitly relied on this "fact" of two erroneous reports as a way to repudiate Defendant's arguments that the three reports were part of a "series."  By doing so, Plaintiffs argued that there were four relevant claims in the case (i.e., each Plaintiff had a claim for each of the two reports) rather than Defendant's position of one relevant claims (i.e., the Plaintiffs together had a single claim from the "series" of erroneous reports).

Thus, one of two things occurred. Either Plaintiffs made a strategic litigation decision to reject the stipulated facts in order to argue for a more favorable legal outcome, or Plaintiffs based the entirety of their briefing on a mistaken factual basis that just happened to support a more favorable legal outcome. Indeed, by now switching positions and claiming that there were indeed *three* erroneous reports, Plaintiffs ask the Court to grant relief on a factual and legal basis that they denied throughout the entirety of their summary judgment filings.

It would be manifest injustice and would undermine the public policy rationale of relying on stipulations if Plaintiffs were permitted to "have [their] cake and eat it too"[7] by rejecting stipulated facts in order to pursue an advantageous litigation strategy, then later

---

[6] Pls.' Combined Resp. (Dkt. 32), at 3 n.2.

[7] *Trujillo v. Colorado*, 649 F.2d 823, 926 (10th Cir. 1981).

**Add.17**

readopting the stipulated facts in order to obtain a more favorable outcome. Accordingly,

the Court holds Plaintiffs to the facts represented and relied on in their motion for summary

judgment: that there were two erroneous reports. A judgment reflecting this outcome will

follow.

      **IT IS SO ORDERED** this 4th day of April 2022.


PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

**Add.18**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| AMERICAN SOUTHWEST MORTGAGE CORP., and AMERICAN SOUTHWEST MORTGAGE FUNDING CORP., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-20-00422-PRW |
| CONTINENTAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## JUDGMENT

This matter came before the Court on a motion for summary judgment seeking declaratory judgment to establish the liability limit of an insurance policy. As previously set forth in the Court's Orders (Dkts. 41 & 51), Plaintiffs are held to their submitted facts of two erroneous audit reports—the 2014 report and the 2016 report—and the Court finds that the two Plaintiffs' claims arising from the same audit report are "interrelated," while claims arising from different audit reports are not "interrelated." This results in two claims, and an applicable liability limit of $2,000,000. Accordingly, Plaintiffs' request for declaratory judgment is **GRANTED** for the reasons set forth in the previous Orders, and declaratory judgment that the liability limit is $2,000,000 is entered in their favor.

**IT IS SO ENTERED** this 4th day of April, 2022, in Oklahoma City, Oklahoma.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

1

**Add.19**

# CERTIFICATE OF DIGITAL SUBMISSION

1. This document complies with the privacy redaction requirements of Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5 because there is no information requiring redaction in this document.

2. All hard copies to be submitted to the Court are exact copies of the version submitted electronically.

3. The electronically submitted version of this document was scanned for viruses with the most recent version of a commercial virus scanning program (Vipre software version 12.3.8147; Definitions version 102348 – 7.92234 [June 29, 2022]; Vipre engine version 5.6.8.8 – 3.0), and according to the program is free of viruses.

/s/ Richard A. Simpson
Richard A. Simpson

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 29, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.


/s/ Richard A. Simpson
Richard A. Simpson